IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARK A. WOODSIDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05-cv-43-DGW |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on the on the Petition for Review of the Commissioner=s

Decision Denying Benefits (entitled "Plaintiff's Brief") filed by the Plaintiff, Mark A.

Woodsides, on October 4, 2004 (Doc. 10).  For the reasons set forth below, and after a review of

the record, that the Commissioner's decision be **REVERSED** and this matter is **REMANDED**

to the agency for further review consistent with this Order

### BACKGROUND

### Procedural History

The Plaintiff, Mark A. Woodsides, filed an application for Disability Insurance Benefits

on August 8, 2001 alleging an onset date of March 3, 2000 (Tr. 100).  The claim was initially

denied on December 15, 2001 (Tr. 65) and upon reconsideration on February 11, 2002 (Tr. 70).

A hearing was scheduled for January 14, 2003 (Tr. 75).  Prior to making a decision, the

Administrative Law Judge held the record open for approximately two weeks to allow for the

submission of updated medical records and the residual functional capacity evaluation form Mr.

Woodsides' treating physician (Tr. 60).  The ALJ issued an unfavorable decision on February

19, 2003 (Tr. 11).  The Appeals Counsel denied the Plaintiff=s request for review on December

3, 2004 (Tr. 4).  He filed his Complaint with this Court on March 24, 2005.

**Substantive History**

**Background and Medical History**

Mark Woodsides suffers from cervical radiculopathy (Tr. 140). He is 5'8 and weighs 276 pounds, making him obese (Tr. 178). He was born January 27, 1959 and completed some undergraduate level course-work in addition to his certifications in law enforcement and over the road trucking (Tr. 25, 29). He is divorced, without children, and lives with his brother in a one-story house (Tr. 29). He worked a range of jobs prior to his condition, varying from boat builder to policeman (Tr. 106). His condition became more severe in October of 1999 when, as a police officer, he suffered a neck injury from chasing two armed robbery suspects (Tr. 31).

On April 3, 2000, Mr. Woodsides was referred to Dr. Sumeer Lal because of cervical pain (Tr. 165). After conducting a physical examination and radiographic assessment as well as obtaining the patient's prior history of a 1983 cervical fusion of the occipital to C3 (T. 165), Dr. Lal determined that Mr. Woodsides might require an occipital-cervical fusion (skull to neck immobilization) (Tr. 166). On April 18, 2000, after reviewing the CT mylogram, Dr. Lal determined that the vast majority of problems stemmed from the C6-7 disc (T.164) and proposed a single level fusion (2 bones) rather than the initial recommendation of a three level fusion (3 bones) (Tr. 138). If a three level anterior discemtomy and fusion were done, this would have been a complete cervical fusion (all neck bones joined together) and there were concerns for Mr. Woodsides inability to move his neck (Tr. 138).

As a second medical opinion, Dr. David G. Kennedy, examined Mr. Woodsides on May 2, 2000 (Tr. 151). The MRI of the cervical spine and the mylogram with CT scan demonstrated degenerative changes at the C4-5, C5-6, and most prominently at C6-7 (Tr. 151). He confirmed

the decision of Dr. Lal to operate and predicted that Mr. Woodsides would be able to return to full normal activity within 3-4 months post-operatively (Tr. 151).

On May 19, 2000, Mr. Woodsides underwent a C6-7 anterior diskectomy and fusion which relieved him from his disc herniation and resulting radiating pain by restricting the movements of two cervical bones (Tr. 140-141).  In the post-operative report, Dr. Lal stated that Mr. Woodsides was no longer capable of working as a police officer and suggested that he receive some type of assistance from disability because of his extremely limited ability to do any type of physical labor (Tr. 138).  Dr. Lal gave this prognosis because MRI imaginary clearly demonstrated that the disc at C4-5 and C5-6 was not in good shape and posed a risk of having problems in the future (T. 138).

On June 26, 2000, Dr. Lal wrote that Mr. Woodsides had significantly improved in terms of his pain but was still at danger for having further problems at the other disc levels that were not fused and may need a complete spinal fusion of the cervical spine (Tr. 162).  Mr. Woodsides also went to Dr. David Kennedy for a follow up visit on September 7, 2000 (Tr. 150).  Dr. Kennedy noted that the patient was making a satisfactory recovery, doing light activities around the house, like mowing the lawn, and suggested that Mr. Woodsides enroll in formal physical therapy over the next six to eight weeks (Tr. 150).  On October 3, 2000, Dr. Kennedy believed that Mr. Woodsides would have an excellent chance of returning to full normal activity with appropriate physical therapy and a work conditioning program (Tr. 149).  In contrast, on November 7, 2000, Dr. Lal reported that Mr. Woodsides' neck was immobilized to a significant degree and as a result could not recommend that Mr. Woodsides assume full active police duties outside of office work (Tr. 159).

3

For the next 5 months, the pain was minimal; but, on December 19, 2000, Dr. Lal reports that Mr. Woodsides started to have neck pain again and some tingling and numbness on the right side of the thumb and index finger (Tr. 158-161).  Instead of attempting surgery again, Dr. Lal prescribed physical therapy and Soma to treat the radiculopathy (Tr. 158).   When the pain moves to Mr. Woodsides' left side in February 2001, the doctor prescribed Neurontin with increasing dosages for five to six weeks to alleviate the pain (T. 157).  While Mr. Woodsides was on Neurontin, Dr. Lal reports on March 19, 2000 that the he was pain free but his neck movements were severely restricted since his neck is essentially fused except for two levels of the cervical spine (Tr. 156).

On Feburary 2, 2001, a MXR Spine 1 view, follow up exam checking on the cervical spine revealed that there was no interval change in alignment or new interval lesions at C6-7 (Tr. 168).  On April 5, 2001, Heartland Rehabilitation conducted a Functional Capacity Evaluation and found that Mr. Woodside would be able to work at a medium physical demand level for an 8 hour workday.  The test results detailed that Mr. Woodsides had a 79% functional strength deficit, a significant deficit and a 22% whole body impairment for the cervical spine (Tr. 146).  On April 27, 2001, after reviewing the functional capacity evaluations performed on Mr. Woodsides, Dr. David Kennedy agreed with Dr. Lal that Mr. Woodsides should be restricted from street activity as a police officer but was working at a medium demand level in terms of lifting (Tr. 148).  Dr. Kennedy also noted that the patient was at the maximum medical improvement (Tr. 148).  In June of 2001, four months after the initial prescription of Neurontin, Dr. Lal wrote to Dr. Dale Blaise, Mr. Woodsides' general practitioner, and suggested lowering

the dosage; but, he also suggested that if the pain returned, he stay on Neurontin long term (Tr. 155).

On November 8, 2001, Mr. Woodsides went to Dr. Raymond Leung for a medical consultation for his disability claim (Tr. 177). Mr. Woodside complained of neck pain but said that he was capable of bending, squatting and prolonged sitting and standing without difficulties (Tr. 177). Dr. Leung reported that the patient was able to heel walk, toe walk and squat but his gait had a mild limp (Tr. 179). He had good grip strength, fine finger movements and no muscle atrophy (Tr. 179). His neck was not tender but there was marked decrease in the motion of the neck. (Tr. 179). Specifically, the neck was limited to 10 degrees of lateral flexion to the left and right, 10 degrees of flexion, 5 degrees of extension, and 25 degrees of rotation to the left and right (Tr. 179-81). Another doctor, Dr. Gary A. Hodge, conducted a second Physical Residual Functional Capacity Assessment in November of 2001, and confirmed the limitations on neck movements and limped gait but also found that Mr. Woodsides would be capable of medium work activity (Tr. 128-135).

A year later, a motor nerve study was conducted (Tr. 218). It indicated that there was cervical radiculopathy involving the right median nerve (radiating pain coming from right median nerve), bilateral median nerve entrapment at the wrist which severely limited sensory involvement bilaterally, ulnar nerve sensory neuropathy (nerve damage/atrophy), and ulnar nerve neuropathy above and below the elbow (Tr. 219).

On January 20, 2003, Dr. David Gerdt, completed another Functional Capacity Evaluation (Tr. 194-198). The conclusions were that the claimant could occasionally lift 10 pound and occasionally lift 20 pound (Tr. 195). He also opined that, in an 8-hour workday, the

5

claimant could sit for work for a total of four hours, 45 minutes at a time and for a total of 1 to 2 hours, stand for 45 minutes at a time for a total of 1 hour and walk for a total of 1 hour (Tr. 195). He indicated that Mr. Woodsides could use his hands and arms for repetitive action such as pushing, pulling, grasping and fine manipulation (Tr. 195). The report noted that Mr. Woodsides complained of constant, moderate pain in the neck and low back and was prescribed Tylenol #3 to relieve the pain (Tr. 197).

**Plaintiff's Statements**

When Mr. Woodsides applied for disability in September of 2001, he filled out a pain questionnaire (Tr. 114). He claimed that the constant pain started in October 1999 but did not start affecting his activities until March 2000 (Tr. 115). The reported pain did not change in nature or location since it started and was located in his neck, shoulders, arms (Tr. 115). He took Neurontin twice daily but the pain continued and there were side effects of dizziness and drowsiness (Tr. 115). He used a soft collar around the neck to help alleviate the pain and also rested and support his head and neck. He described his activities as limited in time and nature like watching television and driving short distances to visit friends. (Tr. 115) He also noted that C4-5 and C5-6 were still herniated and might require surgery in the future which would leave his neck totally immobile (Tr. 115).

At his January 2003 administrative hearing, Mr. Woodsides testified to having pain in his neck "at times" (Tr. 32) and constant dull pain in his neck (Tr. 32). He rated that neck pain on a scale of zero to ten, ten being the worst pain, as a three on a fair day and a seven or eight on a bad day (Tr. 33). He then explained that 22 to 23 days out of a month he would be having a bad day of pain with a level of 7 (Tr. 33). He took Tylenol 3 for the pain, which made him "groggy,

6

drowsy" (Tr. 31-32).  He also experienced lower back pain severe enough to prevent him from walking around every four or five days out of a month (Tr. 35).  However, he admitted that he could go a couple of months without getting such lower back pain (Tr. 35).  He testified as being only able to stand 45 minutes to an hour at a time before having to rest (Tr. 36).  He testified that he could sit for an hour at one time, but was unable to sit for a total of six hours in an eight hour day (Tr. 38) and unable to sit 45 minutes then stand or walk for 15 minutes throughout the day, five days a week (Tr. 37).  He described his daily routine to the judge as mostly watching television (Tr. 43) with about an average of half an hour to 45 minutes per day spent on physical housework (Tr. 42) like doing laundry or going to the grocery store (Tr. 43).

**Vocational Expert Testimony**

The VE described Mr. Woodsides' previous work experience as ranging from heavy, unskilled work to medium skilled work (Tr. 51-52).  The VE also testified that it was his opinion that the skills Mr. Woodsides acquired as a police officer and as a truck driver would transfer to jobs at lesser exertion levels (Tr. 52).  He then went on to explain that the skills gained as a police officer could transfer to surveillance industries that would utilize similar skills but at a lighter level (Tr. 52).  The ALJ inquired if a hypothetical individual similar to the claimant's age, education and past work experience, with the same limitations as claimed by Mr. Woodsides, could perform any of his past work.  The VE said no because of the claimant's testimony of pain and discomfort in the cervical area, problems with low back, side effects of pain medication and reduction in the range of motion in the head and neck area (Tr. 56-57).  The VE concluded that if the testimony of the claimant about his described pain, discomfort and associated limitations

were credible, the person would not be able to maintain employment in the competitive labor market at any exertional level on a sustained basis (Tr. 57).

The ALJ specifically clarified the hypothetical by outlining these following abilities of a person: 1) same age, education and past work experience; 2) capable of lifting or carrying a maximum of five pounds frequently and up to fifteen pounds occasionally, meaning very little up to one-third of an eight hour work day; 3) requirement that individual would have a sit/stand option at the work station; 4) avoid ascending or descending stairs frequently; 5) capable of pushing and pulling motions with upper and lower extremities within the aforementioned weight restrictions; 6) capable of performing activities requiring bilateral manual dexterity for both gross and fine manipulation with reaching and handling; 7) avoid unprotected heights, moving machinery and vibration; and, 8) capable of stopping, balancing, kneeling, crouching or crawling occasionally (Tr. 58). In response, the VE opined that a person with such limitations could not perform any of the claimant's past work (Tr, 58) but could apply the acquired skills to becoming a police dispatcher or obtain other work in the sedentary unskilled job market of the region like retail security (4,000 jobs), security guard gate keeping (3,500 jobs) or sedentary unskilled cashier position (15,000 jobs).

**The ALJ's Findings and Decision**

In concluding that Woodsides was not "disabled" as defined in the Social Security Act, the ALJ considered his age, educational background, work experience and residual functional capacity (Tr. 19). He found that Woodsides had a "severe" impairment, namely, a disorder of the cervical spine which was severe within the meaning of the Regulations but not severe enough to meet or medically equal to one of the impairments listed in Appendix 1, Subpart P,

8

Regulations No. 4.  20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing") (Tr. 17).  Next, he

adopted the lifting and carrying limitations found by Dr. Gerdt that Woodsides could lift 10

pounds and occasionally carry 20 pounds.  However, he rejected Dr. Gerdt's determinations that

the claimant could only sit for 45 minutes at a time for a total of 1 to 2 hours in an 8-hour

workday; stand for 45 minutes at a time for a total of 1 hour in an 8-hour workday; and walk for

a total of 1 hour in an 8 hour workday because they were out of proportion with the objective

medical evidence, the claimant had not undergone significant treatment for his spinal condition

since March 19, 2001 and the claimant was able to do light household chores like sweeping

(Tr.17-18).  However, he found that Mr. Woodsides was unable to perform his past relevant

work (Tr. 18).  In making these determinations, the ALJ found "not entirely credible" Mr.

Woodsides' complaints of disabling pain because it was inconsistent with objective medical

evidence and the claimant was on Tylenol #3, a mild pain reliever (Tr.18).

Based on Mr. Woodsides' residual functional capacity, his age, education, and work

experience, and using the Medical-Vocational Guidelines as a framework for decision-making,

the ALJ concluded that, since Mr. Woodsides was capable of making an adjustment to other

work, he was not "disabled" within the meaning of the Social Security Act (Tr. 19).  On appeal

to this court, Mr. Woodsides argues that (1) the ALJ's determination of Mr. Woodsides' sitting

and standing limitations are unsupported by substantive evidence; (2) the ALJ failed to address a

nerve conductor test that was favorable to the plaintiff; and (3) the ALJ failed to properly

evaluate the Plaintiff's Pain.

**CONCLUSIONS OF LAW**

**Standard for Judicial Review**

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. '405(g)  (AThe findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive. . . .@); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003); Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir. 2001); See also White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005) (stating that Athe reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility@ (quotation marks and citation omitted).  An ALJ=s decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. Golembiewski, 322 F.3d at 915; Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  However, Athe decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.@  Lopez ex. rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401, (1972) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). See also Sims v. Barnhart, 309 F.3d 424, 428 (7th Cir. 2002); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

**Disability Determination and Burden of Proof**

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

10

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists ... in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S .C. § 432(d)(2)(A).

Disability Insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. '423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. '416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 'C.F.R. 416.920(b).   If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . .  physical or mental ability to do basic work activities."  20 C.F.R. '416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. '401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual

functional capacity" and the physical and mental demands of his past work.  If, at this fourth

step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R.

'416.920(e).   However, if the claimant shows that his impairment is so severe that he is unable to

engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish

that the claimant, in light of his age, education, job experience and functional capacity to work,

is capable of performing other work and that such work exists in the national economy.  42

U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

**Substantial Evidence Supports the ALJ's Determination that Plaintiff Could Perform Limited Range of Light and Sedentary Work**

The ALJ rejected Dr. Gerdt's, one of the Mr.Woodsides' treating physicians, findings

that the claimant is limited in his ability to sit, stand and walk because objective medical

evidence does not support it and the claimant has no undergone significant medical treatment

since March 19, 2001 (Tr. 17).  The ALJ also discredited the claimant's testimony concerning

his limitations that he could only stand for 45 minutes to 60 minutes at a time but not for 6 hours

in an 8-hour workday and sit for 30 minutes but not for 6 hours in an 8-hour workday because

the ALJ found it was inconsistent with objective medical evidence and inconsistent with the

claimant's daily activities.

Plaintiff contends that the ALJ summarily dismissed the sitting and standing diagnosis in

the functional capacity evaluation report of the plaintiff's treating physician, Dr. Gerdt, without

substantial evidence for his decision (Pl.'s Mem. at 3).  He further notes that the ALJ disregarded

the nerve conductor test, which was favorable evidence to the plaintiff, as this objective medical

evidence was not discussed in the decision (Pl.'s Mem at 4).  Plaintiff finally contends that the

ALJ erred in his credibility assessment of the plaintiff's testimony of his standing and sitting

12

limitations (Pl.'s Mem' at 3-4).  In contrast, Defendant argues that the ALJ's rejection of Dr. Gerdt's diagnosis of sitting and standing limitations is supported by substantial evidence (Def.'s Mem. at 10).  Defendant further notes that the nerve conductor test did not demonstrate that the Plaintiff has any work-related functional restriction not already accounted for by the ALJ's limited residual functional capacity findings (Def.'s Mem. at 10).  Defendant finally argues that the ALJ properly evaluated the credibility of the plaintiff's testimony about his own sitting and standing limitations.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir.2003); Dixon, 270 F.3d at 1176. (citing 20 C.F.R. § 404.1527(d)(2)).  The ALJ mistakenly dismissed Dr. Gerdt's opinion that Mr. Woodsides was limited to stand only for an hour, walk for an hour and sit for one or two hours because objective medical evidence did not support it.  Dr. Gerdt's opinion is not *inconsistent* with Mr. Woodsides' record of past treatment for cervical radiculopathy.  The medical records of Dr. Raymond Leung, who conducted a consultation with Mr. Woodsides' on November 8, 2001, expressly reports that Mr. Woodsides can walk only 2 blocks before needing to stop because of pain (Tr. 177).  However, the nerve conductor test, which was done on November 27, 2002, did not add any addition objective medical evidence about the patient's sitting and standing limitations (Tr. 218).

If the ALJ was concerned about the lack of objective medical evidence to support Dr. Gerdt's opinion, the ALJ should have solicited additional information. 20 C.F.R. § 404.1527(c)(3); *see also* S.S.R. 96-2p at 4 ("[I]n some instances, additional development

required by a case--for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings--may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); Smith v. Apfel, 231 F.3d 433, 437-38 (7th Cir.2000) (finding that the ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating doctor's opinion controlling weight on that basis).

The ALJ also based his rejection of Dr. Gerdt's sitting and standing limitation because the claimant did not undergo significant treatment for his spinal condition since March 19, 2001. Initially, the Court notes that with respect to Plaintiff's medical treatment, SSR 96-7p is applicable in his favor and provides in pertinent part:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.
>
> 1996 WL 374186, at *7.

SSR 96-7p also sets forth examples for why a claimant may chose not to seek medical treatment; such as, "the individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms ... [or that] the individual may be unable to afford treatment and may

14

not have access to free or low-cost medical services." 1996 WL 374186, at * 8.  The ALJ should have inquired into the reasons which Mr. Woodsides had not pursued any more significant medical attention after his C6-C7 surgery dating May 19, 2000.

The ALJ's decision to discredit the Mr. Woodsides' testimony of his sitting, standing and walking limitations also stems from a narrow view of the record and, at least insofar as the reasons given, is "patently wrong." See Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir.2003) (explaining that an ALJ's credibility determination will not be overturned unless it is "patently wrong" and not supported by the record).  On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, Seventh Circuit Court of Appeals has held that an ALJ's credibility determinations are entitled to considerable weight. See Powers v. Apfel, 207 F.3d 431, 435 (7th Cir.2000) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong.) See, e.g., Young v. Secretary of H.H.S., 957 F.2d 386, 392 (7th Cir.1992) (citing Cheshier v. Bowen, 831 F.2d 687, 690 (7th Cir.1987)).  It is well-established, however, that the ALJ's written decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir.2003) (quoting SSR 96-7p, 1996 WL 374186, at *4).  Where "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result," an ALJ's credibility determination will not be upheld.  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.1996).

The ALJ assumed that the claimant's testimony concerning his ability to sit, stand and

15

walk was exaggerated because it was inconsistent with objective medical evidence and the

claimant's daily activities, which included sweeping, mopping, vacuuming, washing clothes and

shopping.  The ALJ noted how the State Agency medical consultants had the opinion that the

claimant could perform a full range of medium work and how Dr. David Kennedy confirmed that

medium demand level assessment on April 27, 2001.  The ALJ used these examples as contrary

objective medical evidence to Dr. Gerdt's report.  However, even if objective medical evidence

does not support a claimant's testimony, the ALJ must consider other factors like:

> 1.  The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's
> pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any
> medication the individual takes or has taken to alleviate pain or
> other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has
> received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has
> used to relieve pain or other symptoms (e.g., lying flat on his or
> her back, standing for 15 to 20 minutes every hour, or sleeping on
> a board); and
>
> 7. Any other factors concerning the individual's functional
> limitations and restrictions due to pain or other symptoms.
>
> SSR 96-7p, 1996 WL 374186, at *4.

The ALJ simply did not provide the necessary bridge between the evidence and his conclusion.

The ALJ elaborated that the claimant's daily activities were inconsistent with the

claimant's testimony about his sitting and standing limitations.  However, minimal daily

16

activities ... do not establish that a person is capable of engaging in substantial physical activity. See Clifford, 227 F.3d at 872; See also Gentle v. Barnhart, 430 F.3d 865 (7th Cir. 2005) (holding that casual household work does not equate to work in the labor market). In fact, Mr. Woodsides specifically testified that he performed his daily activities for "maybe a half an hour, 45 minutes at most" (Tr. 42). Accordingly, the ALJ erred in his credibility determination of Plaintiff because he mischaracterized his testimony regarding certain daily activities; and, moreover, the ALJ's analysis of Plaintiff's limited and restricted daily activities does not necessarily equate with his ability to perform work-related activities. See e.g., Brown v. Massanari, 2001 WL 1315075, at *2 (N.D.IL. 2001); O'Connor v. Sullivan, 938 F.2d 70, 74 (7th Cir.1996).

**The ALJ Failed to Properly Evaluate the Plaintiff's Pain**

Plaintiff contends that the ALJ erred in his credibility assessment of the his allegations for pain because the ALJ gave insufficient reasons for disregarding it (Pl.'s Mem. at 5). Plaintiff further contends that the ALJ did not discuss his's use or side effects of his medications (Pl.'s Mem. at 5). Defendant, on the other hand, contends that the ALJ properly evaluated Plaintiff's credibility by considering objective medical evidence of Plaintiff's physical impairments and determining that his subjective complaints of pain and other disabling symptoms were not entirely credible based on the record as a whole (Def.'s Mem. at 13-14). Defendant also notes that the ALJ also considered Plaintiff's daily activities and circumstances surrounding Plaintiff's treatment of his impairments as required by SSR 96-7p and reasonably found that he was not disabled (Pl.'s Mem. at 14-15).

SSR 96-7p establishes a two step process for the ALJ evaluating symptoms; such as, pain, fatigue or weakness. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must consider

17

whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms. 1996 WL 374186, at *2. However, if there is no medically determinable physical or mental impairment, or if such an impairment could not reasonably be expected to produce a claimant's pain or other symptoms, the symptoms cannot be found to affect a claimant's ability to do basic work activities. 1996 WL 374186, at *2.

Second, if there is an underlying physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which the symptoms limit a claimant's ability to perform basic work activities. 1996 WL 374186, at *2. If a claimant's statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of a claimant's statements based on consideration of the entire case record.

It bears noting that an ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir.1995) (citations omitted); See also, 20 C.F.R. § 404.1529(c)(2) ("we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements). Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional

18

restrictions, and the claimant's daily activities.  Luna v. Shalala, 22 F.3d 687, 691 (7th Cir.1994)
See also SSR 96-7p, 1996 WL 374186, at *3.

       The Court finds that the ALJ erred in dismissing Plaintiff's testimony regarding his severe pain.  The ALJ not only failed to sufficiently explain why he discredited Plaintiff's testimony regarding the intensity, persistence and functionally limiting effects of his pain as required by SSR 96-7p, but also failed to consider objective medical evidence which would support Plaintiff's testimony regarding pain. Where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations. See Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir.2001).  Although an ALJ "need not discuss every piece of evidence in the record," he also "may not ignore an entire line of evidence that is contrary to the ruling."  Golembiewski, 322 F.3d at 917.  The ALJ ignored the nerve conductor test dated November 27, 2002, which was submitted after the hearing (but which was provided for prior to the decision).  This nerve conductor test expressly reports that the Plaintiff suffers from cervical radiculopathy, also known as radiating neck pain (Tr. 218).  Furthermore, medical records from Dr. Leung and Dr. Gerdt consistently listed the Plaintiff as suffering from pain.  A confidential patient health report dated June 16, 2002 indicates that Mr. Woodsides went to see Dr. Gerdt for "low back pain, pain between the shoulders, neck pain, arm pain, join pain/stiffness, and walking problems" (Tr. 200).  Since Social Security Ruling 96-7p specifically directs an ALJ to consider the consistency of a claimant's complaints and his treatment history, the ALJ's failure to discuss these records completely in his order makes it difficult at best for a reviewing court.

       Next, the ALJ misconstrued Plaintiff's use of his pain medications.   The ALJ  noted that

because the Plaintiff testified to only taking "Tylenol No. 3, a mild pain reliever" this indicated that he was not "debilitated by pain."   However, Plaintiff was prescribed Neurontin starting March 19, 2001 by Dr. Lal (Tr. 156) and remained on it until at least November 9, 2001, when Dr. Gerdt prescribed it again (Tr. 188.)  Within 7 months of his last prescription, and with the intention of reducing his intake, Mr. Woodsides went to Dr. Gerdt complaining of lower back pain and problems walking (Tr. 200).  Also, the ALJ erred when he failed to consider the side-effects of Plaintiff's pain medications which included drowsiness (Tr. 31).  See SSR 96-7p, 1996 WL 374186, at * 3 (one of the factors an ALJ must consider in assessing a claimant's credibility is "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms").  Accordingly, the ALJ erred when he failed to follow the mandates of SSR 96-7p.

Because the ALJ's decision, in its present form, falls below the mark, this Court lacks a sufficient basis to sustain the ALJ's credibility determination and dismissal of Dr. Gerdt's assessment.  The Court is not suggesting that the ALJ's credibility determination or dismissal was incorrect, but only that greater elaboration is necessary.  Accordingly, the ALJ must conduct a reevaluation of Mr. Woodsides' ability to sit, stand and walk as well as his complaints of pain and with due regard for the full range of medical evidence.

### CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** to the agency for further review consistent with this Order.

**DATED: March 31, 2006**

<u>**s/ Donald G. Wilkerson**</u>
**DONALD G. WILKERSON**
**United States Magistrate Judge**

21